**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| NOURISH OUR NEIGHBORS, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:24-cv-299 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| CITY OF DAYTON, OHIO *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

---

**ENTRY AND ORDER GRANTING, IN PART, AND DENYING, IN PART,
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 16); AND
GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (DOC. NO. 22)**

---

Presently before the Court are Plaintiff Nourish Our Neighbors' ("NON") Motion for Summary Judgement ("NON's Motion") (Doc. No. 16) and Defendants City of Dayton, Ohio ("Dayton") and Shelley Dickstein's ("Dickstein") (collectively, "Defendants") Motion for Summary Judgement ("Defendants' Motion") (Doc. No. 22) (collectively, the "Motions"). In brief, Plaintiff filed the instant action, alleging Dayton City Ordinance § 137.21 is—both on its face and as applied to NON—violative of the First Amendment Free Speech Clause, the Fourteenth Amendment Equal Protection Clause, and the Fourteenth Amendment Due Process Clause. (Doc. No. 1 at PageID 10–14.) By its Motion, NON moves for summary judgement as to all three alleged constitutional violations. (*See generally* Doc. No. 16.) Similarly, Defendants move for summary judgment on all three of NON's claims. (*See generally* Doc. No. 22.) For reasons stated below, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, NON's Motion (Doc. No. 16) and **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, Defendants' Motion (Doc. No. 22).

1

## I.     BACKGROUND

At the heart of this case is the constitutionality of Dayton City Ordinance § 137.21 (the

"Ordinance" or "§ 137.21"). (Doc. No. 1 at PageID 5–10.) The Ordinance, in its entirety, provides:

(A) No person shall prepare or distribute food, clothing, or toiletries in a public place within the central area of the city without a permit issued by the city. No person shall fail to comply with a permit issued by the city pursuant to this section.

(B) A person applying for a permit issued pursuant to this section shall provide the city with the following information:
   (1) Type and quantity of food, clothing and toiletries applicant intends to prepare and/or distribute in a public place within the central area of the city;
   (2) Location of public place where applicant intends to prepare and/or distribute food, clothing, and toiletries within the central area of the city;
   (3) Date and time applicant intends to prepare and/or distribute food, clothing and toiletries in a public place within the central area of the city and the estimated number of recipients of the food, clothing and toiletries;
   (4) Number of persons applicant intends to use preparing and/or distributing food, clothing and toiletries in a public place within the central area of the city and the estimated number of recipients of the food, clothing and toiletries;
   (5) Location and number of toilet facilities, if any, applicant shall make available for use by persons consuming food prepared and/or distributed by the applicant in a public place within the central area of the city; and
   (6) Arrangements, if any, made by the applicant to provide parking, traffic and crowd control and safety, and trash and litter collection and disposal, during and immediately after the preparation and/or distribution of food, clothing, and toiletries in a public place within the central area of the city.

(C) Upon receipt of an application containing all of the information required by this section and the payment of a non-refundable application fee of $50.00, the City Manager, or authorized representative, shall issue a permit pursuant to this section unless:
   (1) The Police Chief and/or Director of Public Works, or their authorized representatives, demonstrate by clear and convincing evidence that the toilet facilities, parking, traffic and crowd control and safety, and/or trash and litter collection and disposal arrangements made by the applicant are inadequate to protect persons and property and preserve the public health, safety, and welfare; or
   (2) The applicant violated this section within the past 12 months; provided, however, that the applicant with a single violation in the past 12 months shall receive a permit upon depositing with the city $250.00 as security to cover all costs incurred by the city resulting from any failure by applicant to comply with this section and the permit issued to applicant pursuant to this section. The city shall return the security deposit, or the unexpended

2

portion of the security deposit, to the applicant within 30 days of the date of the specified permit. The applicant remains responsible for all costs incurred by the city in excess of the security deposit.

(D) The City Manager, or authorized representative, shall issue or deny a permit pursuant to this section within seven days of receipt of an application submitted in accordance with this section. A permit issued pursuant to this section shall incorporate by reference the information provided by applicant in applying for the permit, and shall provide adequate parking, traffic and crowd control measures, trash and litter collection and disposal arrangements, and toilet facilities to protect persons and property and preserve public health, safety and welfare. A person denied a permit shall receive written reasons for that denial.

(E) A permit issued pursuant to this section is valid for a single, uninterrupted use not to exceed six consecutive hours, starting at the date and time specified in the permit. The city shall issue only one permit per location within the same 24-hour period of time, and shall not issue a permit for another public place within 1,000 feet of that location during the same 24-hour period of time.

(F) For purposes of this section, "a public place within the central area of the city" is any street, boulevard, alley, sidewalk, plaza or open space owned by the city, the State of Ohio or any other political subdivision of the State of Ohio and located within an area inclusive of and bounded by the Miami and Mad rivers to the north; Keowee Street to the east until it traverses the Railroad; the Railroad line as the southern boundary; with the western boundary being the Miami River.

(G) This section does not apply to any person issued a food vendor's permit or license by the Montgomery County Combined Health District, or otherwise lawfully occupying a public space within the central area of the city pursuant to a permit or license issued by the city, the State of Ohio or any other political subdivision of the State of Ohio.

(H) Any person who violates this section is guilty of a misdemeanor of the fourth degree.

Dayton Revised Code of General Ordinances § 137.21(A)–(H).

NON is a 501(c)(3) nonprofit organization funded entirely by grassroots donations and comprised of approximately 30 volunteers, who provide food, clothing, and hygiene products to the homeless population in the downtown Dayton area. (Doc. Nos. 18-1 at PageID 195; 1 at PageID 3–4.) In addition to furnishing charitable services and resources, NON purports to convey a message—namely its members' "belief that society has failed and overlooked its most vulnerable citizens." (Doc. No. 1 at PageID 3.) To that end, NON commonly posts and distributes flyers containing messages along similar lines to advertise for its events: "We believe food is a human

right[,] not a luxury. Sharing meals is how we build community." (*See* Doc. No. 18-2 at PageID 213–15.) NON also hands out literature at its events. (Doc. No. 18-1 at PageID 194.) Since the enactment of the Ordinance in 2005, law enforcement has issued two citations for Ordinance violations, once in April of 2024 and again in November of 2024, both times against NON. (Doc. No. 19-1 at PageID 312–13.) The complaints precipitating both incidents were not made as a result of safety, health, property damage, or traffic concerns, but rather for permitless food distribution. (*Id*. at PageID 333–34.)

During the first incident on April 7, 2024, NON hosted a food distribution event in Courthouse Square, located in downtown Dayton. (Doc. No. 1 at PageID 9.) On display at the event was a banner that read, "BUILDING COMMUNITY THROUGH MEALS!" (*See generally* Pl. Ex. 9, Body Cam Footage.)[1] During the event, Sargeant Jon Zimmerman ("Sargeant Zimmerman") with the Dayton Police Department approached certain NON members in attendance to inquire about whether NON had a permit to distribute food. (*Id*. at 1:22–1:37.) According to Sargeant Zimmerman, he was dispatched to the event to address a complaint regarding the operation of a food distribution event without a permit. (*Id*. at 1:26–1:27.) Multiple NON members indicated they were unaware of the permit requirement and did not have a permit to distribute food that day. (*Id*.) Sargeant Zimmerman then informed the members that their event violated the Ordinance, and that he could arrest members if they continued to operate it and distribute food. (*Id*. at 4:24–6:54.) For approximately 48 minutes, Sargeant Zimmerman discussed the requirements of the Ordinance with the members, fielded their questions, listened to their concerns about the constitutionality of the Ordinance, and attempted to gain voluntary compliance,

---

[1] On January 12, 2026, NON filed an Unopposed Motion for Leave to File Document (Doc. No. 21). By that motion, NON requested permission to submit a thumb drive of the body camera footage depicting the April 2024 event. (*Id*. at PageID 457.) The Court granted that motion, and NON subsequently mailed to the Court a thumb drive, which the Court relies on for purposes of this section. (*See* Doc. No. 23.)

all the while reminding the members that their continued operation would constitute an arrestable offense. (*Id*. at 1:15–49:18.) During that time, the NON members discontinued food distribution. (*Id*.) Then, amid his conversation with a few members, Sargeant Zimmerman observed one NON member take a burrito from a table, walk a distance away, and hand the burrito to a homeless person, despite having already been admonished against doing so. (*Id*. at 49:18–49:42.) Sargeant Zimmerman proceeded to approach the volunteer, handcuff him, and detain him in his patrol vehicle. (*Id*. at 49:43–51:55.) Although Dayton summonsed that individual, no charges were brought following the April 2024 incident. (Doc. No. 18-8 at PageID 271.)

Similarly, in November of 2024, law enforcement received a complaint that NON was operating a food distribution event without a permit. (Doc. No. 18-3 at PageID 230.) Upon arrival, law enforcement confirmed that NON did not have a permit and thereafter gathered the personal information of the volunteers involved. (*Id*.) Following the November 2024 incident, Dayton brought charges against two individuals but has since withdrawn those charges. (Doc. No. 18-8 at PageID 271.)

Shortly after the November 2024 incident, NON brought the instant suit on November 19, 2024. (Doc. No. 1.) Following the discovery period, NON filed its Motion for Summary Judgment on January 12, 2026 (Doc. No. 16). Defendants responded on February 10, 2026 (Doc. No. 28), and NON replied on February 23, 2026 (Doc. No. 29). Defendants filed their cross Motion for Summary Judgment on January 12, 2026 (Doc. No. 22). NON responded to Defendants' Motion on February 9, 2026 (Doc. No. 25), and Defendants replied on February 23, 2026 (Doc. No. 30). Consequently, both Motions are ripe for review and decision.

II.     **STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on

5

which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, affidavits or sworn declarations, and admissions on file, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(a), (c).

The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id*. at 248–49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e). Additionally, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to

6

determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id*. District courts are also at liberty to decide pure questions of law on motions for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

III.     ANALYSIS[2]

By their Motions, both parties seek summary judgment as to all three alleged constitutional violations—the First Amendment Free Speech Clause, the Fourteenth Amendment Equal Protection Clause, and the Fourteenth Amendment Due Process Clause. (*See generally* Doc. Nos. 16, 22.) The Court therefore addresses the Motions' contentions as to each constitutional provision in turn.

### A.  First Amendment Free Speech Clause

Not all speech is afforded constitutional protection, as certain kinds of speech "have been understood to fall outside the scope of the First Amendment." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025). NON argues, and Defendants seem to deny, that NON's conduct—the charitable distribution of food, clothing, and literature viewed in the specific context of NON's

---

[2] In its Motion, NON requests the opportunity to make oral argument pursuant to Local Rule 7.1(b)(2). (Doc. No. 16 at PageID 79.) Because the Court believes it can adequately dispose of both Motions based solely on the record, NON's request for oral argument is **DENIED**. (*See id*.)

events—constitutes expressive speech protected by the First Amendment. (Doc. Nos. 16 at PageID 93; 28 at PageID 548.) As a threshold matter, then, the Court must determine whether the conduct at issue is considered expressive speech.

### 1. Expressive Conduct

The First Amendment "protects the right to be free from government abridgement of speech." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009).[3] It is well settled that First Amendment protection extends beyond "spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). That is to say, conduct is protected "when it is expressive or communicative in nature." *Fowler v. Board of Education*, 819 F.2d 657, 664 (6th Cir. 1987). The Supreme Court has articulated a two-part inquiry for determining whether conduct qualifies as expressive conduct and is therefore afforded First Amendment protection. *See Spence v. Washington*, 418 U.S. 405, 410–11 (1974). Courts are to consider: (1) whether "an intent to convey a particularized message [is] present," and (2) whether "in the surrounding circumstances the likelihood [is] great that the message would be understood by those who view[] it." *Id*. However, the Supreme Court and the Sixth Circuit alike have also noted that "[t]he threshold is not a difficult one, as 'a narrow, succinctly articulable message is not a condition of constitutional protection.'" *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir. 2005) (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995)). Instead, the inquiry rests on "the nature of the [speaker's] activity, combined with the factual context and environment in which it was undertaken," *Spence*, 418 U.S. at 409–10, and whether the conduct "in context, would

---

[3] Neither party disputes that the First Amendment applies to state and local governments through the Fourteenth Amendment. *See B. A. v. Tri Cnty. Area Schs.*, 156 F.4th 782, 789 (6th Cir. 2025) (citing *Free Speech Coal.*, 606 U.S. at 470).

reasonably be understood by the viewer to be communicative." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984).

Here, NON's conduct undoubtedly qualifies as expressive speech. On display at the April 2024 event when Seargent Zimmerman spoke with NON members was a large banner that read, "BUILDING COMMUNITY THROUGH MEALS!" (Pl. Ex. 9, Body Cam Footage, at 6:43.) And NON's flyers espouse an evident message: "We believe food is a human right[,] not a luxury. Sharing meals is how we build community." (Doc. No. 18-2 at PageID 214.) While mere food and clothing distribution in itself may not qualify as expressive conduct, NON's distribution, coupled with its display of promotional advertisements/banners and dissemination of literature, is surely intended to convey a message, that food is a human right and its distribution builds community, which is likely understood by those who view it. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240–42 (11th Cir. 2018) (finding plaintiff's food sharing event to be expressive conduct where plaintiff displayed signs that said, "food is a human right, not a privilege"); *see also Ater v. Armstrong*, 961 F.2d 1224, 1226 (6th Cir. 1992) (finding the distribution of literature qualifies as protected speech under the First Amendment); *cf. First Vagabonds Church of God v. City of Orlando*, 638 F.3d 756, 758 (11th Cir. 2011) (assuming without deciding that feeding the homeless is expressive conduct protected by the First Amendment). Viewed in context, NON emphasizes that its food and clothing items are free, specifically targets Dayton's homeless population when disseminating its flyers, and holds its events in areas in downtown Dayton near government buildings and where homeless people are known to congregate. (Doc. No. 18-1 at PageID 196, 199.) And, "[a]lthough the choice of location alone is not dispositive, it is nevertheless an important factor in the factual context and environment" courts are to consider in determining whether the conduct at issue is indeed

9

expressive conduct. *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1242 (internal quotation marks and citations omitted). Taken together, all facets of NON's operations clearly amount to expressive conduct for purposes of First Amendment protection.

### 2. Type of Forum

Ordinarily, the second step in the Free Speech analysis would be to determine the type of forum where the protected speech is held. *See Bays v. City of Fairborn*, 668 F.3d 814, 820 (6th Cir. 2012) ("The [second] step, then, is to identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic. (quotation marks and citations omitted)); *see also United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738, 746 (6th Cir. 2004) ("The [Supreme] Court has identified three types of forums: the traditional public forum, the designated public forum, and the nonpublic forum. Traditional public forums are those places which by long tradition or by government fiat have been devoted to assembly and debate. [The] Government may also create a public forum by its designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." (quotation marks and citation omitted)). But because Defendants do not dispute, nor does the Court have any reason to otherwise conclude, that NON hosts its events in traditional public forums—most often, the Courthouse Square—the Court does not dwell on this issue. (*See* Doc. Nos. 22 at PageID 472; 28 at PageID 542 (applying the content neutral test for public forums); *see also Pouillon v. City of Owosso*, 206 F.3d 711, 717 (6th Cir. 2000) (holding a plaza situated along the city hall steps qualified as a traditional public forum).) And in any event, it matters not whether the Courthouse Square constitutes a traditional public forum or a designated public forum, "as the relevant

10

constitutional tests in the context of this case are the same." *Parks v. Finan*, 385 F.3d 694, 697 (6th Cir. 2004).

### 3. Facially Content Based or Content Neutral

Having established the conduct at issue qualifies as constitutionally protected expressive conduct, the Court next turns to NON's position that the Ordinance, on its face, is an unconstitutional prior restraint on speech. (*See* Doc. No. 16 at PageID 95–98.) The parties, however, disagree over which level of scrutiny applies. While NON assumes the Ordinance qualifies as a prior restraint and is therefore presumptively unconstitutional, Defendants believe the facial content neutrality of the Ordinance renders intermediate scrutiny applicable. (*Id*. at PageID 93; Doc. No. 28 at PageID 541.) The foundational issue, then, is which test applies to the case at bar.

In *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009), the Sixth Circuit had occasion to clarify this very distinction. Expanding on Supreme Court precedent, the *H.D.V.-Greektown* court explained that lower courts are to apply what is commonly referred to as the *Freedman* framework when an ordinance is content based and apply the *Thomas* rule when an ordinance is content neutral. 568 F.3d at 621 (citing *Freedman v. Maryland*, 380 U.S. 51 (1965); *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002)). "Under the *Freedman* framework, 'a facial challenge lies whenever a licensing law gives a government official substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.'" *Id*. at 620 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988)). In accordance with *Freedman*, courts are to look to the degree to which the approving authority is assigned "unbridled discretion" in granting or denying permits and ensure the ordinance contains "precise and objective criteria" to guide the approver's decision. *Id*. at 620–

11

21 (citation and quotation marks omitted). By contrast, the *Thomas* framework applies to "content-neutral, time, place, and manner restrictions." *Id*. at 621 (citation and quotation marks omitted). Under *Thomas*, an ordinance is "subject to the requirement that it contain 'adequate standards to guide the [licensing] official's discretion and render it subject to effective judicial review.'" *Id*. (alteration in original) (quoting *Thomas*, 534 U.S. at 323). More precisely, "a content-neutral permit scheme (a) 'must not be based on the content of the message,' (b) 'must be narrowly tailored to serve a significant governmental interest,' and (c) 'must leave open ample alternatives for communication.'" *Id*. (quoting *Thomas*, 534 U.S. at 323 n. 3). The applicable test hinges on the language of the ordinance—that is, whether the ordinance is content based or content neutral on its face.

"The principal inquiry in determining content neutrality, . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). That is to say, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994). Meanwhile, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Id*.

Turning to the Ordinance at hand, only under two expressly enumerated circumstances may the city manager or authorized representative deny a permit. *See* § 137.21(C)(1)–(2). First, a permit "shall" be issued unless "[t]he Police Chief and/or Director of Public Works, . . . demonstrate by clear and convincing evidence that the toilet facilities, parking, traffic and crowd control and safety, and/or trash and litter collection and disposal arrangements made by the applicant are inadequate to protect persons and property and preserve the public health, safety, and welfare."

12

§ 137.21(C)(1). Second, an applicant will be denied a permit if he or she has violated the Ordinance within the past 12 months and fails to tender a refundable $250 security deposit. § 137.21(C)(2). Nowhere does the permit-denial language of the Ordinance make reference to the content of speech disseminated during the food sharing process. In other words, irrespective of the message espoused when sharing food—whether it be political, religious, artistic, or otherwise motivated—an applicant will be denied a permit if it is shown by clear and convincing evidence that the proposed arrangements are inadequate to protect persons and property.[4] *See Thomas*, 534 U.S. at 322 ("The Park District's ordinance does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say."); *see also Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1292 (11th Cir. 2021) (finding a park regulation facially content neutral where it applied "not just to food sharing events but also to a host of other social services, including the provision of clothing, shelter, and medical care").

The Court also finds it prudent to touch on NON's scruples with the discretion afforded to the approving official under the Ordinance. (Doc. No. 29 at PageID 568–69.) Not all prior restraints are *per se* unconstitutional; rather, their constitutionality hinges on the extent to which the approving officer is given *carte blanche* in granting and denying permits. *See Plain Dealer*

---

[4] To the Court's knowledge, the Sixth Circuit has yet to address the issue of whether food sharing is inherently expressive conduct. Other courts, however, have found that food sharing, alone, is not inherently expressive conduct. *See Fort Lauderdale Food Not Bombs*, 901 F.3d at 1241 ("It should be no surprise, then, that the circumstances surrounding an event often help set the dividing line between activity that is sufficiently expressive and similar activity that is not. Context separates the physical activity of walking from the expressive conduct associated with a picket line or a parade."); *Krishna Lunch of S. California, Inc. v. Gordon*, 797 F. App'x 311, 313 (9th Cir. 2020) ("Krishna Lunch has plausibly pleaded that its distribution of sanctified vegan and vegetarian food ("prasada") is, *in context*, expressive conduct for purposes of First Amendment protection." (emphasis added)); *First Vagabonds Church of God v. City of Orlando*, No. 6:06-CV-1583, 2008 WL 899029, at *5 (M.D. Fla. Mar. 31, 2008) ("*Given this context*, it is possible that the conduct of feeding people could be expressive . . . ." (emphasis added)). Therefore, to the extent NON argues the Ordinance is content based because it regulates food sharing, which alone is inherently expressive conduct, the Court disagrees. Food sharing, viewed in light of the context of NON's particular circumstances, is expressive conduct, but food sharing in a vacuum is not.

*Publ'g Co.*, 486 U.S. at 757 ("[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."). That an approving official is permitted *some* discretion in granting and denying permits does not warrant a finding of facial unconstitutionality. *See Thomas*, 534 U.S. at 324–25. According to the Supreme Court, although unbridled discretion is certainly problematic, the same cannot always be said for cabined discretion:

> Petitioners contend that the criteria set forth in the ordinance are insufficiently precise because they are described as grounds on which the Park District "may" deny a permit, rather than grounds on which it *must* do so. This, they contend, allows the Park District to waive the permit requirements for some favored speakers, while insisting upon them for others. That is certainly not the intent of the ordinance, which the Park District has reasonably interpreted to permit overlooking only those inadequacies that, under the circumstances, do not harm the policies furthered by the application requirements. Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements.

*See id.*; *cf. Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007) ("[T]he prior restraint of a licensing provision *coupled with unbridled discretion* itself amounts to an actual injury." (emphasis added)). This Court would err if it were to require an ordinance so exacting as to proscribe any degree of discretion for approving authorities. So, while a facially content-neutral ordinance that adequately circumscribes the approving authority's discretion is not subject to a presumption of unconstitutionality as are some prior restraints, it nevertheless must withstand the time, place, and manner regulation test handed down by the Supreme Court. As such, the Court next turns to whether the Ordinance contravenes the rule promulgated in *Thomas*.

### 4.  The *Thomas* Time, Place, and Manner Test

As mentioned, under *Thomas*, an ordinance: "(1) must contain adequate standards to guide the official's decision, (2) must not be based on the content of the message, (3) must be narrowly

14

tailored to serve a significant government interest, and (4) must leave open ample alternatives for communication." *H.D.V.-Greektown*, 568 F.3d at 623 (citing *Thomas*, 534 U.S. at 323 & n.3). The Court takes up the parties' arguments as to each prong in succession.

### a. Adequate Standards to Guide the Official's Decision

NON, for its part, believes the Ordinance is insufficiently specific or objective to pass constitutional muster. (Doc. No. 16 at PageID 90.) More specifically, NON takes issue with the purported indefiniteness and subjectivity of the provisions of the Ordinance that delineate the grounds under which the approving authority may deny a permit application. (Doc. No. 16 at PageID 90.) Recall, the Ordinance provides for permit application denial in two situations: first, where the approver "demonstrate[s] by *clear and convincing evidence* that the toilet facilities, parking, traffic and crowd control and safety, and/or trash and litter collection and disposal arrangements made by the applicant are *inadequate* to protect persons and property and preserve the public health, safety, and welfare[;]" and second, where the applicant has violated the Ordinance within the past year and fails to tender a $250 security deposit. § 137.21(C)(1)–(2) (emphasis added). NON's disagreements lie primarily with the former provision. It is NON's position that the terms, "clear and convincing evidence" and "inadequate" are unworkable and lend to subjective denial based solely on the whims of the approver. (Doc. No. 16 at PageID 90.) In support of its contention, NON points to the deposition of David Escobar ("Mr. Escobar"), Dayton's city engineer, who is tasked with approving and denying permit applications. (*See id*. (citing Doc. No. 17-1 at PageID 153, 159).) In the cited deposition excerpts, Mr. Escobar was questioned about his customary procedure in approving or denying permits. (Doc. No. 17-1 at PageID 153, 159.) According to his testimony, Mr. Escobar does not use a specific formula when determining whether an application meets the above threshold but rather relies on his own

15

experience and the expertise of those counseling him. (*Id*.) It is the imprecision of the Ordinance's denial language, according to NON, that does not comport with the constitution.

Relying on the facts of *Thomas*, Defendants believe the Supreme Court has explicitly ratified similar permit-denial language. (Doc. No. 28 at PageID 542.) In *Thomas*, the ordinance authorized denial for a variety of reasons, as delineated in further detail below. *See* 534 U.S. at 324. Defendants argue that, under substantially similar circumstances as the present case, the *Thomas* Court determined that the disputed provisions were reasonably specific and objective to accord with the First Amendment. (Doc. No. 28 at PageID 542.) The Court here is inclined to agree.

"[A] statute or ordinance must contain narrow, objective, and definite standards to guide those who exercise the authority to restrict protected constitutional rights. The standards must be susceptible to objective measurement; and the terms of the regulation should be precisely defined." *Broadway Books, Inc. v. Roberts*, 642 F. Supp. 486, 490 n.2 (E.D. Tenn. 1986) (internal citations omitted). "A statute is unconstitutionally vague if . . . it is an unrestricted delegation of power which leaves the definition of its terms to law enforcement officers." *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608–09 (6th Cir. 2005). The ordinance at issue in *Thomas* is an instructive comparator:

> [T]he Park District may deny a permit only for one or more of the reasons set forth in the ordinance. It may deny, for example, when the application is incomplete or contains a material falsehood or misrepresentation; when the applicant has damaged Park District property on prior occasions and has not paid for the damage; when a permit has been granted to an earlier applicant for the same time and place; when the intended use would present an *unreasonable danger to the health or safety of park users or Park District employees*; or when the applicant has violated the terms of a prior permit.

534 U.S. at 324 (emphasis added). And as Defendants note, the Supreme Court did indeed find that "[t]hese grounds are reasonably specific and objective, and do not leave the decision 'to the whim

16

of the administrator.'" *Id*. (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992)). The Court subsequently clarified that, while granting permits to favored speakers and denying them to disfavored ones would certainly be unconstitutional, the proper vehicle to protest such discrimination would be an as-applied challenge, rather than a facial one. *Id*. at 325.

The same logic applies here. That the Ordinance lacks a precise mathematical formula for determining when an application's specifications are "inadequate" or that it allows for the approver to use his or her prior experience in the review process does not move the needle in NON's favor. And this Court does not stray from the beaten path in concluding as much. In *Parks v. Finan*, the court grappled with an ordinance that required speakers to obtain a permit to hold speeches and public gatherings in a capitol square. 385 F.3d at 696. Among other criteria, the *Parks* ordinance provided for discretionary application approval where, based on the approver's assessment, the intended use "was *appropriate* to the physical context of the capitol buildings or grounds[,]" would "not *unduly burden* the managing authority[,]" and would not present a "hazard to the safety of the public or state employees . . . ." *Id*. at 696 n.2 (emphasis added). Disagreeing with the district court, the Sixth Circuit concluded the ordinance's grounds for denial were sufficiently precise because "[t]here is no statute or regulation imaginable that does not require some degree of interpretation by the agency charged with its enforcement." *Id.* at 699. The Court here is not persuaded that the terms, "inadequate" and "clear and convincing" in the present Ordinance are altogether dissimilar from the use of terms like "appropriate" in the *Parks* ordinance. *See id*. ("In our view, the standards 'appropriate to the physical context of the capitol,' 'hazard to the safety of the public,' and 'expose the state to the likelihood of [unrecoverable expenses],' are not so vague as to engender content-based favoritism." (alteration in original)). As such, the same principle stands, and the Ordinance at issue contains sufficiently objective and definite denial standards.

17

### b.  Content Neutrality

The second prong under the *Thomas* test dictates that the ordinance in question must not be based on the content of the message. *See H.D.V.-Greektown*, 568 F.3d at 623 (citing *Thomas*, 534 U.S. at 323 & n.3). Because the Court has already found the Ordinance content neutral above, it does not belabor the point much further here. To be content neutral, the governmental interest must be "unrelated to the suppression of free expression . . . ." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). "Even a content-neutral purpose, however, cannot save a regulation that 'on its face draws distinctions based on the message the speaker conveys.'" *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1292 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015)).

As delineated in greater detail above, the Ordinance regulates the time, place, and manner in which Daytonians may "distribute food, clothing or toiletries in a public place within the central area of the city . . . ." § 137.21(A). And the Ordinance's purported purpose is "to protect persons and property and preserve the public health, safety, and welfare[.]" § 137.21(C)(1). Nowhere does the Ordinance's language contain any mention of the message espoused during the food sharing process, nor does it, by its language, discriminate based on the kind of speaker distributing food or the recipient accepting it. *See Fort Lauderdale Food Not Bombs*, 11 F.4th at 1292 ("The Rule does not single out messages which relate to food or the importance of food sharing with the homeless."). Accordingly, the Ordinance meets the second *Thomas* prong—that is, the Ordinance is not based on the content of the message.

### c.  Narrowly Tailored to Serve a Significant Government Interest

The Court begins with the simpler and less contentious component of the third *Thomas* prong—whether the Government has a significant interest at stake. By its language, the

Ordinance's purported purpose is "to protect persons and property and preserve the public health, safety, and welfare" of Dayton's citizens. § 137.21(C)(1). NON seemingly agrees with Defendants that the Ordinance's purpose qualifies as a significant government interest. (*See* Doc. No. 29 at PageID 573 ("To be sure, the City has an interest in minimizing threats to public health and safety in its public spaces."); *see also Bays*, 668 F.3d at 822 (finding that "ensuring smooth pedestrian traffic flow, increasing public safety, and relieving congestion and overcrowding" undoubtedly qualify as "legitimate government interests" in certain contexts). While the Court does not wholeheartedly disagree with the parties, it nevertheless finds it crucial to qualify its assent.

In fact, NON, whether wittingly or otherwise, calls into question the substantiality of the government's interest in pointing to various other ordinances which, based on the record, adequately achieve the proffered governmental interests: "Time and again courts have held that the availability of other ordinances directed at an asserted government interest can demonstrate that a challenged ordinance is overly broad." (Doc. No. 16 at PageID 100.) NON cites to a variety of ordinances which serve to "preserve public health, safety, and welfare" just as the Ordinance here purports to do. (*See* Doc. No. 29 at PageID 573.) Those cited ordinances, which are not at issue and are currently being enforced, are dedicated to regulating littering, obstruction of public places, disorderly conduct, impeding traffic, noise pollution, damaging property, public urination and defecation, and large public gatherings. (*See* Doc. No. 16 at PageID 99–100 (citing Dayton City Ordinance § 98; Dayton City Ordinance § 137.07; Dayton City Ordinance § 137.01; Dayton City Ordinance § 71.52; Dayton City Ordinance § 133.03; Dayton City Ordinance § 137.23).) The Court agrees with NON: the existence of those ordinances, which clearly serve to further all the interests ostensibly advanced by the Ordinance at issue here, calls into question the efficacy of the Ordinance's methodology. *See Bays*, 668 F.3d at 823 ("Although it consistently argues reduced

19

congestion and smooth traffic flow as the purposes behind the solicitation policy, Fairborn '*must do more than . . . assert interests that are important in the abstract*.'" (emphasis added) (quoting *Saieg*, 641 F.3d at 737)). As this Court and higher courts see it, if other existing laws adequately address the government's purported interests, then the Ordinance likely fails for lack of narrow tailoring because the substantiality of the purported interest is dubious at best:

> In determining whether regulation of expressive activity is narrowly tailored, we look to determine whether the substantial government interest would be achieved less effectively without the permitting scheme. Particular types of individual activity that might cause damage, endanger public safety, or interfere with other speakers, can be governed just as effectively, if not more so, by regulations prohibiting or limiting such actions directly, without imposing the requirement that individuals wanting to speak or carry a sign obtain a permit 15 days ahead of time.

*Parks*, 385 F.3d at 703 (citations omitted); *see also Harcz v. Boucher*, 763 F. App'x 536, 542–43 (6th Cir. 2019) (finding the government's interests overly abstract where the ordinance sought to achieve crowd control and public safety, where there was no evidence the plaintiff's conduct posed a threat to either of those interests).

Here, the record indicates only two citations have been issued since the enactment of the Ordinance in 2005—both against NON members and both for operating permitless events. (Doc. No. 19-1 at PageID 312–13.) Never has NON, or anyone else for that matter, been issued a citation under the Ordinance for a violation concerning interference with the public health, safety, and welfare of Dayton's citizens. (*Id.* at PageID 336.) If the Ordinance was indeed enacted to further those interests, but various other ordinances adequately achieve those same interests, and no one in the Ordinance's history has been cited for thwarting those interests, it begs the question: are those truly the interests sought to be achieved by the Ordinance? With a connection so attenuated, the Court is not so sure. Dubiously substantial government interests aside, and assuming without deciding that substantiality exists for the sake of argument, the Court next turns to the second and

20

more hotly contested element of the third *Thomas* prong—whether the Ordinance is narrowly tailored to serve governmental interests.

Once again, the Ordinance prohibits any Daytonian from "prepar[ing] or distribut[ing] food, clothing, or toiletries in a public place within the central area of the city without a permit issued by the city." § 137.21(A). NON avers this provision suffers from an overbreadth issue because, by its plain language, the Ordinance applies to any situation involving food distribution, whether it be one person casually gifting food to another individual or a large-scale event with hundreds of attendees. (Doc. No. 16 at PageID 96–97.) In other words, this language, according to NON, is untenable because it lacks the requisite specificity to allow members of the public to determine which situations trigger the permit requirement. (*Id.* at PageID 96.) To gain insight as to when exactly the Ordinance kicks in, NON posed various hypothetical questions to Jason Hall ("Commander Hall"), the commander of the Support Services Division at the Dayton Police Department. (*See generally* Doc. No. 19-1.) For instance, when asked whether one person giving their leftover taco to a homeless person in the downtown area without a permit would constitute an Ordinance violation, Commander Hall indicated that although that scenario may be a technical violation, it is a "de minimis" one and likely would not result in Ordinance enforcement. (*Id.* at PageID 316.) But when asked at what point a violation extends beyond a de minimis infraction, Commander Hall could not identify a number and instead indicated enforcement would "depend on how many tacos" were being distributed. (*Id.* at PageID 318–19.) Similarly, Commander Hall suggested a permit would not be required if a family hosted a birthday party in Courthouse Square and distributed food, even if that family included 100 members. (*Id.* at PageID 320–21.) In Commander Hall's view, such an event would not be "categorize[d] as a food distribution event" because requiring a permit for family gatherings is not in line with the "spirit" of the Ordinance.

(*Id*.) And yet, NON has received two citations for hosting permitless events. (*Id*. at PageID 312.) It is the dearth of any language narrowly tailoring the reach of the Ordinance, according to NON, that subjects its members to the arbitrary whims of the enforcer. (Doc. No. 16 at PageID 96–97.)

Defendants, meanwhile, contend the Ordinance is, in fact, narrowly tailored to achieve governmental interests. (Doc. No. 28 at PageID 545–46.) However, Defendants seem to conflate their objective-standards argument with their narrow-tailoring argument: "[The Ordinance] provides that a completed permit accompanied by the $50.00 fee[5] shall be issued; moreover, [the Ordinance] outlines the limited ways that a permit can be denied. As such, [the Ordinance] is narrowly tailored to further the aforementioned substantial governmental interests." (*Id*.) By way of support, Defendants distinguish the facts of the present case from those in *Fort Lauderdale Food Not Bombs* ("*FLFNB*"), where the Eleventh Circuit found that the ordinance at issue was not narrowly tailored to achieve the city's interest. (*Id*. at PageID 545 (citing 11 F.4th at 1295).)

In *FLFNB*, the ordinance "ban[ned] social service food sharing in Stranahan Park <u>unless</u> authorized pursuant to a written agreement with Fort Lauderdale." 11 F.4th at 1272. There, the court found that the ordinance was not narrowly tailored because it "impose[d] a permitting requirement without implementing <u>any</u> standards to guide the City officials' discretion over whether to grant a permit." *Id*. at 1295. But *FLFNB* is inapposite. Unlike the case at bar, the ordinance in *FLFNB* did not list a single ground upon which a permit application could be denied, leaving the applicant wholly at the mercy of the approver. *Id*. As illustrated above, the Ordinance here is not deficient for want of objective denial standards. And, importantly, an ordinance can be inadequately tailored even where it contains sufficiently objective standards to curb the approver's discretion. *See Parks*, 385 F.3d at 699, 705 (holding the ordinance contained "clear and precise

---

[5] By NON's own admission, it does not contest the cost of the fee, but rather the permit requirement at large. (*See* Doc. No. 25 at PageID 498 n.1. ("But Plaintiff does not challenge the cost of the permit.").)

standards" to guide the approver's decision in denying permits and yet nevertheless was not "narrowly tailored to the [government's] interests" because of the breadth of speech thwarted by the language of the ordinance). All told, the Ordinance's denial language is not the issue with its tailoring. Instead, the Court addresses an issue raised by NON and unanswered by Defendants: whether the Ordinance, which by its plain language prohibits all permitless food, clothing, and toiletry distribution within the downtown area, is narrowly tailored to achieve the identified governmental interests. In short, it is not.

Even where an ordinance furthers a significant governmental interest, "government officials remain constrained by the dictates of the First Amendment." *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 605. "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests[;]" however, it also "need not be the least restrictive or least intrusive means of serving the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citations and quotation marks omitted). "The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Ward*, 491 U.S. at 782–83. Although this analysis often requires an ad hoc approach, as the outcome may vary based on the language of each individual ordinance, circuit precedent is instructive here.

In *Bays v. City of Fairborn*, the Sixth Circuit reversed this very Court's denial of the plaintiff's motion for preliminary injunction, finding that the solicitation policy was "unconstitutional because it [was] not narrowly tailored to further [Fairborn's] interests." 668 F.3d at 823. In *Bays*, Fairborn hosted a festival in a public park where venders could submit applications

for booth space to sell merchandise. *Id*. at 817. The festival's solicitation policy proscribed any

and all unauthorized "sales or soliciting of causes outside of the booth space[]" during the festival.

*Id*. at 818. When the plaintiff was told he could not preach alongside the booths or hand out

literature in the park without prior authorization, the *Bays* court said the following about the

overbreadth of the regulation:

> The scope of the Festival solicitation policy, which prohibits sales or soliciting of causes outside of booth space, is "substantially broader than necessary." On its face, the policy prohibits any solicitation of causes, including displaying signs, distributing literature or leafletting, and one-on-one conversations, if those conversations are motivated by a desire to solicit certain causes, such as the plaintiffs' religious message. Fairborn claims in its brief that the solicitation policy does not prohibit "one-on-one discussions" outside of booths, but instead only restricts sign display, leafletting, and "stationary preaching." This interpretation is inconsistent with the plain language of the policy, which does not distinguish between solicitation by conversation and solicitation by "stationary preaching . . . ."

*Bays*, 668 F.3d at 823 (quoting *Ward*, 491 U.S. at 800). Because the solicitation policy's plain

language intentionally prohibited leafleting, while simultaneously prohibiting one-on-one

discussions, albeit unintentionally, the *Bays* court found the regulation overbroad.

The *Parks* court came to a very similar conclusion. In *Parks*, the regulation prohibited all

permitless use of the capitol grounds "for the purpose of governmental business, public meetings

for free discussion of public questions, [and] for activities of a broad public purpose . . . ." 385

F.3d at 696 n.2. The court similarly found this language overreaching:

> [U]nder the CSRAB permit scheme, two friends debating which candidate should be elected President in November while walking across the Capitol grounds are regulated by the permitting scheme, at least according to its literal terms, but it is highly unlikely that these people would continue their discussion if they knew a permit was required to do so. . . . The permit fee and the bureaucratic formalities involved in obtaining a permit are likely to chill casual speakers who would otherwise make statements on Capitol Square but find that the benefit of expression is far outweighed by the expense of applying for a permit. While these examples may appear far-fetched, there is no apparent way that the present regulation, applied

24

as it has been, can easily be read not to apply. . . . The permitting scheme is thus a substantially overbroad restriction on individual speech.

*Id.* at 702; *see also Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 165–66 (2002) ("It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."); *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 569 (1987) ("Under such a sweeping ban, virtually every individual who enters the airport may be found to violate the resolution by engaging in some 'First Amendment activit[y].'" (alteration in original)). In other words, because "the permitting scheme swe[pt] a broad array of ordinarily protected speech within its regulatory purview[,]" it went too far. *Parks*, 385 F.3d at 702.

While the above cases involved ordinances that stifled individual speech, the Sixth Circuit has also addressed the issue of inadequate tailoring in the context of small group speech. *See Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 608. In *American-Arab Anti-Discrimination Committee* ("*AAADC*"), the ordinance at issue made it "unlawful to participate in any special event upon *any street, park or public area* of the City of Dearborn unless such activity is granted approval by resolution by the City Council." *Id*. at 603 (emphasis in original). Under the ordinance, "special event" was defined as "*any walkathon, bikeathon, or jogging group, or other organized group having a common purpose or goal, proceeding along a public street or other public right-of-way* in the City of Dearborn[.]" *Id*. (emphasis in original). Finding the ordinance's language insufficiently tailored, the *AAADC* court said as follows:

> Permit schemes . . . that potentially apply to small groups are nearly always overly broad and lack narrow tailoring. The Ordinance is overly broad because under the Ordinance as written, any procession of people with a common purpose or goal,

25

whether it be a small group of protestors or a group of senior citizens walking together to religious services, are conceivably required to obtain a permit from the city of Dearborn. . . . Because the Ordinance would include almost any imaginable procession on Dearborn's streets or sidewalks, the Ordinance, as written, is hopelessly overbroad. For the same reason, the Ordinance lacks narrow tailoring.

*Id*. at 608. Because the *AAADC* ordinance by its plain language could, presumably, encompass a vast array of conduct—only some of which the regulation actually sought to restrict—the *AAADC* ordinance did not survive the narrow tailoring prong. *Id*.

Turning to the present case, the Ordinance mandates that "*[n]o person* shall prepare or distribute food . . . without a permit issued by the city." § 137.21(A) (emphasis added). The term, "no person," it seems, encompasses any person in the downtown Dayton area distributing food. In fact, Commander Hall's deposition testimony exemplifies this quandary. (*See* Doc. No. 19-1 at PageID 316.) It bears reiterating that, when asked whether one person giving their leftover food to a homeless person in the downtown area without a permit would constitute an Ordinance violation, Commander Hall indicated that, although that scenario may be a technical violation, it likely would not result in Ordinance enforcement. (*Id*.) It is rather perplexing that the Ordinance can prohibit, say, 10 NON members from distributing food in Courthouse Square and simultaneously waive the permit requirement for two friends sharing lunch or a family gathering of 100 people where food is distributed simply because enforcement as to the latter two scenarios would not be in the "spirit" of the Ordinance. (*See id*. at PageID 321.) The Court is hard-pressed to fathom how the Ordinance—which, by its language broadly bans a wide variety of food-distribution events but in practice only bans those which are not in keeping with the "spirit" of the Ordinance—could be narrowly tailored to serve governmental interests.

The only justification Defendants seem to raise in support of the Ordinance's tailoring is the fact that its regulatory reach is confined to the downtown area: "[The Ordinance] only regulates

26

such distribution without a permit in the central area of the city." (Doc. No. 22 at PageID 476.) This argument is equally unavailing. In *Saieg v. City of Dearborn*, the Sixth Circuit held that the city's leafletting restriction, which was geographically confined to a certain area, was unconstitutionally tailored even though speakers could obtain a booth and practice speech outside of the geographical confines of the regulation. 641 F.3d at 738–40. Just as in *Saieg*, although the Ordinance here only regulates conduct in the downtown Dayton area, that fact does not absolve it of its lack of narrow tailoring.

All this is to say, because the Ordinance here is overly broad in that it regulates more than it intends to, and various other laws on the books adequately advance the interests listed in the Ordinance, it is not narrowly tailored to serve the government's interests.

### 5. Ample Alternatives for Communication

Having found that the Ordinance is not narrowly tailored to serve Defendants' purported interests, the Court need not delve into whether ample alternatives of communication are available. *See Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 607 ("And because we have already found that the Ordinance is not narrowly tailored, whether the city of Dearborn has provided ample alternatives of communication is now irrelevant in this case; providing ample alternative means of communication will not cure a defective regulation if Dearborn's thirty-day notice provision sweeps too broadly."); *Bays*, 668 F.3d at 825 ("'The requirements for a time, place, and manner restriction are conjunctive,' so it is unnecessary to reach the issue of whether Fairborn has left open ample alternative channels of communication." (quoting *Saieg*, 641 F.3d at 740)).

All things considered, NON would like to paint a picture of an Orwellian restraint, designed to hamstring its cause at every turn. Not so. As the Court concluded above, the Ordinance, as it stands, does not unduly discriminate based on the speaker or the content of speech, contains

sufficiently objective denial standards, and, although vague, does not purport to further a wholly non-existent or insubstantial government interest. But the Ordinance stumbles at the third *Thomas* hurdle—it is not narrowly tailored to serve the government's proffered interests. And for that reason, the Ordinance runs afoul of the First Amendment on its face.

### 6. As-Applied Challenge

The Sixth Circuit has said as follows regarding the distinction between facial and as-applied challenges: "A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications, to take the law off the books completely[;]" in contrast, in an as-applied challenge, the plaintiff "argues that a law is unconstitutional as enforced against the plaintiff[] . . . ." *Speet v. Schuette*, 726 F.3d 867, 871–72 (6th Cir. 2013). Ordinarily, courts address as-applied challenges before facial ones because "this sequence decreases the odds that facial attacks will be addressed unnecessarily . . . ." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 327–28 (6th Cir. 2009). But because a facial attack is a "'challenge to a statute that *in all its applications* directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest[,]' . . . . 'there is no reason to limit challenges to case-by-case 'as applied' challenges when the statute on its face and therefore in all its applications falls short of constitutional demands.'" *Speet*, 726 F.3d at 873 (emphasis added) (quoting *Sec'y of State v. Joseph H. Munson Co.,* 467 U.S. 947, 966 n. 13 (1984)). Therefore, the Court does not reach the question of whether the Ordinance violates the First Amendment as applied to NON because, as delineated above, the Ordinance is unconstitutional on its face.

Accordingly, the Court **GRANTS** NON's Motion for Summary Judgment only insofar as it requests a finding that the Ordinance is unconstitutional on its face for lack of narrow tailoring

28

(Doc. No. 16). Likewise, the Court **DENIES** Defendants' Motion for Summary Judgment as it pertains to the First Amendment (Doc. No. 22).

### B. <u>Fourteenth Amendment Equal Protection Clause</u>

Next, the Court tackles the parties' contentions dealing with the Equal Protection Clause of the Fourteenth Amendment. (*See* Doc. Nos. 16 at PageID 102–03; 22 at PageID 476–78.) NON believes the Ordinance violates the Equal Protection Clause because it is enforced in a discriminatory manner—more specifically, it is only enforced against those sharing food with the homeless. (Doc. No. 16 at PageID 102.) In other words, NON seems to contend that, although the Ordinance may be neutral on its face, it is discriminatory in its application. (*Id*.) NON further argues the Ordinance survives neither strict scrutiny nor rational basis review. (*Id*. at PageID 102–03.) Defendants, meanwhile, believe rational basis review applies because NON, a charity that assists the homeless, does not fall within a suspect class or quasi-suspect class, and distributing food is not a fundamental right. (Doc. No. 22 at PageID 477.) Defendants further aver the Ordinance complies with said standard. (*Id*.)

The Equal Protection Clause mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "[E]qual protection challenges to laws that 'neither implicate[ ] a fundamental right nor target a suspect class' are subject to rational basis review." *Fowler v. Benson*, 924 F.3d 247, 261 (6th Cir. 2019) (alteration in original) (quoting *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010)). "On rational-basis review, a statutory classification such as the one at issue comes before the Court bearing a strong presumption of validity, and those attacking its rationality have the burden to negate every conceivable basis that

might support it." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 307 (1993). To ascertain which level of scrutiny applies, the Court must first determine whether a charitable food distribution organization qualifies as a suspect class or whether food distribution constitutes a fundamental right.

Time and time again courts have held that low-income individuals do not qualify as a suspect class. *See Maher v. Roe*, 432 U.S. 464, 471 (1977) ("[T]his Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis."); *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 660 (6th Cir. 2008) ("[A] class of less wealthy individuals is not a suspect class warranting strict scrutiny review."). And NON identifies no cases—nor can the Court locate any—that indicate charitable organizations qualify as a suspect or quasi-suspect class. *See Indep. Charities of Am., Inc. v. Minnesota*, 82 F.3d 791, 797 (8th Cir. 1996) (applying rational basis review to a charitable organization's equal protection challenge); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1481 (6th Cir. 1995) (affirming the district court's denial of suspect classification and application of rational basis review to an ordinance that distinguished between various charitable organizations); *First Vagabonds Church of God v. City of Orlando*, 610 F.3d 1274 (11th Cir.) ("[B]ecause the distinction drawn by the law (those with City licenses or contracts, and those without them) does not involve a suspect classification, the rational basis test applies."), *reh'g en banc granted and opinion vacated on other grounds*, 616 F.3d 1229 (11th Cir. 2010). What's more, the Court is not convinced food distribution qualifies as a fundamental right. *See Redlich v. City of St. Louis*, 550 F. Supp. 3d 734, 761 (E.D. Mo. 2021) ("[T]here is no fundamental right infringed upon by the alleged differential treatment in requiring a permit to distribute food to the homeless."), *aff'd*, 51 F.4th 283 (8th Cir. 2022); *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, (2d Cir. 1996) ("Daniel's

30

choice as to how to spend his free time, and whether or not he will perform any volunteer services, is not the stuff to which strict scrutiny is devoted.").

Because NON has not carried its burden in demonstrating that it is either a member of a suspect class or that charitable food sharing is a fundamental right, rational basis scrutiny applies. "Rational basis review affords a statute a 'strong presumption of validity,' and the statute 'must be upheld so long as there is a rational relationship between the disparity of treatment and some legitimate government purpose.'" *Clark v. Banks*, 193 F. App'x 510, 515 (6th Cir. 2006) (quoting *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000)). "The [C]ourt is obligated to uphold the statute 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id*. (quoting *Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001).

Here, the Ordinance requires that the applicant submit an application which provides for "adequate parking, traffic and crowd control measures, trash and litter collection and disposal arrangements, and toilet facilities to protect persons and property and preserve the public health, safety and welfare" of Daytonians, and further allows for denial of a permit application in the event that the application falls short of those requirements. § 137.31(D). As discussed above, even if somewhat abstract, Dayton has an interest in preserving the public health, safety, and welfare of its citizens, so that fact is not in dispute. The Court preliminarily notes that the Ordinance, on its face, makes no mention of the distributors or recipients of the food distributed—homeless or otherwise—but rather distinguishes between those with permits and those without. However, because NON raises an as-applied challenge, the Court must assess whether the Ordinance's distinction between permitted and permitless food distributors, as applied to NON, is rationally related to the government's interests in promoting public health, safety and welfare.

31

In a case not dissimilar to the present one, the Eleventh Circuit dealt with an ordinance that "required sponsors of feedings of large groups within the Greater Downtown Park District to obtain a permit . . . ." *First Vagabonds Church of God*, 638 F.3d at 759. That ordinance defined "large groups" as those likely to attract 25 or more people. *Id*. The purported interest achieved by the ordinance was to lessen the burden on certain high-traffic parks by limiting the number of large group feedings. *Id*. Much like the present case, the regulation distinguished not based on the recipients of the distributed food, but between those who obtained permits and those who did not. *First Vagabonds Church of God*, 610 F.3d at 1289. There, the Eleventh Circuit found a rational link between the ordinance's distinction and the government's interest:

> Even if we accept for the sake of discussion that the exempted vendors and the general public are otherwise similarly situated, a rational basis exists for distinguishing between the two classes consistent with the City's asserted interests: the City could rationally conclude that it can more effectively regulate the vendors' conduct in parks directly through the contracts or licenses.

*Id*. Put differently, the court opined that the government's interest in lessening the burden on highly traveled parks was rationally related to, and therefore justified, the regulation's distinction between permitted and permitless distributors. *Id*.

Here, the same logic follows. The Ordinance—which requires prospective applicants to obtain a permit and propose submissions with "adequate parking, traffic and crowd control measures, trash and litter collection and disposal arrangements, and toilet facilities"—is rationally related to Dayton's interest in "protect[ing] persons and property and preserv[ing] the public health, safety and welfare" of Daytonians. § 137.31(D). It is this plausible link between the government's interest and the Ordinance's classification that renders NON's Equal Protection contentions unavailing.

32

Accordingly, the Court **DENIES** NON's Motion for Summary Judgment as to its Equal Protection Clause claim (Doc. No. 16) and **GRANTS** Defendants' Motion for Summary Judgment as to the same (Doc. No. 22).

### C. Fourteenth Amendment Due Process Clause

At last, the Court addresses the parties' Due Process Clause assertions. NON argues that the Ordinance violates the Due Process Clause because it infringes on its "fundamental right to engage in charity[.]" (Doc. No. 16 at PageID 104.) Because charity is deeply rooted in our nation's history, or so NON's argument goes, the Ordinance's deprivation of that right is without due process. (*Id*.) In the same vein as their Equal Protection argument, Defendants maintain that the Ordinance is not violative of the Due Process Clause because "there is no stand-alone fundamental right to engage in charity." (Doc. No. 22 at PageID 479.) The Court concurs.

As discussed above, precedent weighs against NON here—to this Court's knowledge, neither the Supreme Court nor any courts of appeal appear to have recognized the right to engage in charity as a fundamental one. Instead, courts have addressed the constitutionality of ordinances regulating charitable solicitation but nevertheless analyzed the propriety of such ordinances under a First Amendment framework, rather than a Due Process one. *See e.g., Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 639 (1980) (applying First Amendment intermediate scrutiny to an ordinance that regulated charitable solicitation). And because the Ordinance's restrictions are rationally related to governmental interests, there can be no Due Process violation.

Accordingly, the Court **DENIES** NON's Motion for Summary Judgment as to its Due Process Clause claim (Doc. No. 16) and **GRANTS** Defendants' Motion for Summary Judgment as to the same (Doc. No. 22).

33

IV.    **CONCLUSION**

Based on the foregoing, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, NON's Motion for Summary Judgment (Doc. No. 16), and likewise **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, Defendants' Motion for Summary Judgment (Doc. No. 22). The Court specifically finds as follows:

1. The Court **GRANTS** NON's Motion for Summary Judgment (Doc. No. 16) insofar as it seeks a declaration that the Ordinance violates the First Amendment on its face. For the same reason, the court **DENIES** Defendants' Motion for Summary Judgment (Doc. No. 22) as it pertains to the First Amendment;

2. The Court **GRANTS** NON's request for an injunction (See Doc. No. 1 at PageID 14) and hereby **ORDERS** that Defendants are **ENJOINED** from further enforcement of the Ordinance;

3. As the parties' papers relate to the Equal Protection Clause, the Court **DENIES** NON's Motion for Summary Judgment (Doc. No. 16) and **GRANTS** Defendants' Motion for Summary Judgment (Doc. No. 22); and

4. As they relate to the Due Process Clause, the Court **DENIES** NON's Motion for Summary Judgment (Doc. No. 16) and **GRANTS** Defendants' Motion for Summary Judgment (Doc. No. 22).

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, June 23, 2026.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

34